S13A1224. MUSE v. THE STATE.
(748 SE2d 904)

BLACKWELL, Justice.

Appellant Beth Ann Muse was tried by a Walton County jury and convicted of murder and the unlawful possession of a firearm during the commission of a felony, both in connection with the fatal shooting of her husband, Mark Muse. At trial, Appellant admitted that she killed Mark, but she argued that the killing was justified. Now, she appeals, contending that she was denied the effective assistance of counsel. We see no error and affirm.[1]

---

[7] Although defense counsel did not interview the victim's aunt, she did review her statement prior to trial.

[1] The crimes were committed on January 2, 2009. Appellant was indicted on July 24, 2009 and charged with malice murder, felony murder, aggravated assault, and unlawful possession of a firearm during the commission of a felony. Her trial commenced on October 18, 2011, and

1. Viewed in the light most favorable to the verdict, the evidence shows that Appellant learned in late 2008 that Mark was having an affair with a co-worker. At first, Appellant said that she wanted to save their marriage, and she urged him to go to marital counseling. In December 2008, Mark agreed to counseling, although he also said that he wanted a permanent relationship with his lover. On December 26, Mark told Appellant that he was leaving her.

The next day, Appellant reported that she had found a burglar in the home that she and Mark shared, and Sergeant Joseph Broccoli[2] of the Walton County Sheriff's Office responded to the report. Appellant told Sergeant Broccoli that the burglar fled when she saw him, and she gave a description of the burglar that was consistent with the description of a suspicious man whom her neighbor had reported in the area a few weeks earlier.[3] As he looked around the Muse home, Sergeant Broccoli observed that the master bedroom appeared to have been ransacked, but he noticed that jewelry and firearms had been left behind, in plain view.

On the morning of December 28, Appellant drove herself to a hospital, where she complained of dizziness, nausea, and light-headedness. Appellant told the hospital staff that she suspected that her husband had given her a "date-rape" drug. According to a nurse, however, the symptoms that Appellant reported were not consistent with the ingestion of such a drug. Her symptoms instead were more consistent with a virus.

Also on December 28, after Appellant returned home from the hospital, she called for Sergeant Broccoli, and he again responded to the Muse residence. There, Appellant asked him about the circumstances in which one would be justified in shooting an intruder in self-defense. Sergeant Broccoli explained that, if a person were in fear of her life, she could use a firearm in self-defense and fire it until the

the jury returned its verdict four days later, finding Appellant guilty on all counts. Appellant was sentenced to imprisonment for life for malice murder and imprisonment for a consecutive term of five years for unlawful possession of a firearm during the commission of a felony. The verdict as to felony murder was vacated by operation of law, *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993), and the aggravated assault merged with the malice murder. Appellant timely filed a motion for new trial on October 27, 2011, and she amended it on November 14, 2011, again on April 19, 2012, and yet again on May 23, 2012. The trial court denied her motion for new trial on November 28, 2012. Appellant timely filed a notice of appeal on November 30, 2012, and the case was docketed in this Court for the April 2013 term and argued on July 1, 2013.

[2] Actually, Sergeant Broccoli was a corporal in December 2008, but he had been promoted to sergeant by the time of trial. In this opinion, we refer to him as a sergeant.

[3] In November, the neighbor had reported that a suspicious man had attempted to enter her garage and that he also walked across the property of the Muses. Appellant had knowledge of her neighbor reporting the suspicious man.

threat no longer was present. Appellant also asked how to fire a gun so as to kill someone, and she asked how to use the firearms in her home, including a .40 caliber handgun. In addition, Appellant told Sergeant Broccoli about her impending divorce, that she feared losing her two-year-old son to Mark in the divorce, that Mark acted "funny" when he did not take his medication, and that she feared Mark as well as other unnamed persons.[4]

Mark spent New Year's Eve in an Atlanta hotel with his lover. On the afternoon of January 1, he returned home. The next morning, around 3:00 a.m., Appellant called 911, and Sergeant Broccoli again responded to the home, where he found Appellant in the marital bedroom,[5] and Mark lying on the floor, next to a spoon. Mark had sustained five gunshot wounds, one of which was fatal. According to a crime scene investigation, Mark had been shot first in his chest, then fatally in his head, and then, as he lay on the floor, three times in the area of his groin and abdomen. Appellant told Sergeant Broccoli that she had shot Mark and that he had sexually assaulted her.

About the alleged sexual assault, Appellant initially told investigators that it occurred between 9:30 and 10:00 p.m. on January 1, but she later said that it occurred between 9:00 p.m. and midnight. Appellant explained that Mark had entered their bedroom and stood between her and the door. She said that she told him that she wanted to leave, but he would not let her. Appellant claimed that Mark then touched her breast, removed her pants, put his fingers into her vagina, and performed oral sex on her. Appellant added that she told Mark to stop, but he refused, and she could not overpower him. She also said that Mark masturbated and eventually ejaculated into his hand. Appellant explained that she shot Mark when he returned to their bedroom several hours after the alleged assault. In her discussions with investigators, she did not claim to have seen a weapon in his hand. She also did not admit that Mark had been carrying a bottle

---

[4] About her fear of her husband, a chiropractor who had treated Appellant testified at trial that she had injuries consistent with domestic abuse. The chiropractor acknowledged, however, that her injuries also might have been caused by a fall, car crash, or other accident, and he admitted that Appellant never said anything to him about abuse. The marriage counselor who counseled the Muses testified that Appellant had said that she previously had been in an abusive relationship, but the counselor did not testify that Appellant reported that Mark had abused her. Appellant has pointed us to no evidence, and we have found none, that she reported physical abuse by Mark to anyone prior to his death. After she was arrested, Appellant claimed that Mark had abused his first wife and daughter, but both testified at trial and denied any abuse.

[5] Appellant was seated on the edge of a bed on which there were two firearms and two loaded magazines.

of liquid hydrocodone, which Appellant had been prescribed, and which was found on the floor of the bedroom closet with blood on the label. The blood on the label matched a blood sample taken from Mark.

At trial, there was evidence of Internet searches by Appellant in the weeks before she shot Mark. At first, she had searched for information that one might expect to be of interest to someone trying to save a marriage. Then, on December 26, when Mark said that he was leaving her, Appellant began to search for information about divorce attorneys and child custody laws. On December 27, the day that Appellant went to the hospital and asked Sergeant Broccoli about firearm use, she searched the Internet for information about personal defense, laser sights for firearms, and "date-rape" drugs.

Upon our review of the entire record, we conclude that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Appellant was guilty of the crimes of which she was convicted. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant claims that she was denied the effective assistance of counsel and that the trial court, therefore, ought to have granted her motion for a new trial. To prevail on her claim of ineffective assistance, Appellant must prove both that the performance of her lawyer was deficient and that she was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of her lawyer was deficient, Appellant must show that her lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also *Kimmelman v. Morrison*, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that she was prejudiced by the performance of her lawyer, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). See also *Williams v. Taylor*, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden, although not impossible to carry, is a heavy one. See *Kimmelman*, 477 U. S. at 382 (II) (C). We conclude that Appellant has failed to carry her burden.

(a) First, Appellant argues that her lawyer was ineffective when he failed to object to a closure of the courtroom during voir dire. The trial court did not close the courtroom for the entirety of voir dire, but it did so when the prospective jurors were asked questions about certain sensitive subjects, including their own experiences with

marital infidelity, sexual abuse, and domestic violence. The right of public trial is guaranteed by the United States and Georgia Constitutions, *Purvis v. State*, 288 Ga. 865, 866 (1) (708 SE2d 283) (2011), and the right extends to the voir dire of prospective jurors in criminal cases, among other proceedings. *Presley v. Georgia*, 558 U. S. 209, 213 (130 SCt 721, 175 LE2d 675) (2010). See also *State v. Brown*, 293 Ga. 493 (2) (748 SE2d 376) (2013). In some circumstances, however, "[t]he right to public trial may give way . . . to other rights or interests, such as the defendant's right to a fair trial," and we have held before that it sometimes may be permissible for a trial court to close a portion of voir dire to the public for "the express purpose of maximizing the odds of an impartial jury and thus a fair trial." *State v. Abernathy*, 289 Ga. 603, 611 (5) (715 SE2d 48) (2011) (citations and punctuation omitted).

In this case, at the hearing on the motion for new trial, Appellant's trial lawyer testified that he did not object to the closing of the courtroom for a limited part of the voir dire because he thought that it would encourage prospective jurors to speak more candidly about their own experiences with marital infidelity, sexual abuse, and domestic violence, and such candor would allow him to more effectively assess the prospective jurors and exercise his peremptory strikes. Moreover, the lawyer said that he conferred with Appellant about closing the courtroom for a part of the voir dire, and he did not recall that she objected to it. This Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U. S. at 689 (III) (A) (citation and punctuation omitted). We cannot say that it was unreasonable for the lawyer to think that closing the courtroom might facilitate his efforts to assess the prospective jurors and strike as favorable a jury as possible, and Appellant has failed, therefore, to overcome the strong presumption that the failure of her lawyer to object to the closing was a reasonable trial strategy.

(b) Next, Appellant claims that her lawyer was ineffective because he did not object when the prosecuting attorney at trial offered evidence of testimony that Appellant had given in a pretrial immunity hearing.[6] On her motion for a new trial, her lawyer explained that he informed her at the immunity hearing that she did not have to testify, and he advised her that, if she did testify, her words would be "burned into the record." When asked if he informed her that her

---

[6] Asserting that her shooting of Mark was justified, Appellant moved before trial for immunity pursuant to OCGA § 16-3-24.2.

testimony at the hearing might later be used against her, he responded, "[i]n a manner of speaking, yes." He then explained that, although he might not recall the precise words he had spoken to her, he did recall discussing with her whether it was wise for her to testify at the hearing, given that she would be exposed to cross-examination, and there would be a record of what she said. Eventually, both the lawyer and Appellant concluded, however, that she ought to testify at the hearing, and she did.

At trial, her lawyer did not object when the prosecuting attorney read her testimony from the immunity hearing, in part because the lawyer believed that such an objection would be meritless. But the lawyer also had strategic reasons for not objecting. He explained, for instance, that the reading of her earlier testimony gave the jury an opportunity to hear the account of Appellant, without subjecting her to the risk of cross-examination at trial. Moreover, her lawyer thought that Appellant had "held up fairly well" during cross-examination at the immunity hearing, and that her testimony made out a "palatable case" for justification. And her lawyer believed that the reading of her testimony from the immunity hearing was especially helpful to the extent that she had, in that testimony, expanded upon her statements to investigators. We cannot say that the lawyer's strategy for not objecting was unreasonable, and even if an objection at trial might have had some merit,[7] Appellant has failed to overcome the "strong presumption" that her lawyer performed reasonably.

(c) Last, Appellant claims that her lawyer was ineffective because he did not realize at trial that a law enforcement officer had given inaccurate testimony about DNA, and as a result, he failed to object to that testimony or to rebut it. The officer in question testified about the absence of male DNA in the breast and labial swab samples taken from Appellant after Mark was shot. In the course of his testimony, the officer said that, if saliva had been in the samples, DNA would have been detected, and he explained that "DNA contains both, covers both the saliva and the DNA from semen." But at the hearing on the motion for new trial, Appellant presented uncontradicted evidence that DNA would not always be found in saliva. Appellant says that the inaccurate testimony by the officer at trial made it "impossible" for the jury to believe her account of a sexual assault involving oral sex, and her lawyer should have objected or rebutted the inaccurate

---

[7] We offer no opinion about the merit of such an objection, but we note that its merit is not apparent from the case law, which also cuts against a finding that any reasonable lawyer would have made the objection. See *Contreras v. State*, 314 Ga. App. 825, 829-830 (3) (726 SE2d 107) (2012).

testimony. He did not, apparently because he did not understand the officer to have testified inaccurately.

Even if the failure of the lawyer to better understand whether DNA would be expected in saliva amounted to deficient performance,[8] Appellant has failed to show that she was prejudiced as a result of such performance. Her own expert admitted on the motion for new trial that DNA *might* be found in saliva, if the saliva were mixed with cells from the mouth or elsewhere, and the record contains nothing about the likelihood that DNA would be found in saliva transferred during oral sex, especially the sort of violent oral sex that Appellant described. And in any event, the prosecution in this case did not build its case around disproving the contention that Mark performed oral sex on Appellant. In fact, the prosecution did not even depend upon disproving the occurrence of a sexual assault. As the prosecuting attorney put it in closing argument, "[t]his case is not about [Appellant's] abuse." To the contrary, the prosecuting attorney argued that, even if Mark had assaulted Appellant as she claimed, she still would not have been justified in shooting him several hours later.[9] And the prosecuting attorney never argued that the physical evidence — whether DNA, saliva, or bruising — was inconsistent with a sexual assault. Accordingly, we are unconvinced that Appellant has shown "a reasonable probability that, but for [her lawyer's failure to object to, or rebut, the inaccurate testimony of the officer,] the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). For these reasons, Appellant has failed to carry her heavy burden to prove ineffective assistance of counsel.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 23, 2013.

*Brian Steel*, for appellant.

---

[8] We offer no opinion about whether it was, in fact, deficient performance. We note, however, that the lawyer consulted with several experts as he prepared to defend Appellant, including a psychologist, an expert in Battered Women's Syndrome, a forensic pathologist, a retired law enforcement officer, and a DNA expert, among others.

[9] The prosecuting attorney did argue that the claim of a sexual assault should be disbelieved, but she did not cite any physical evidence (or lack thereof) as reasons for such disbelief. Instead, the prosecuting attorney argued that Appellant had been unable to give a consistent account of the timing of the alleged assault and that, during the time that the assault allegedly occurred, the evidence showed that Mark was exchanging text messages with his lover about a football game, about diaper changing, and about having tried rutabagas for the first time.

*Layla H. Zon, District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, David A. Bikoff, Assistant Attorney General, for appellee.*