**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0610. FREEMAN v. THE STATE.                    DO-022 C

DOYLE, Presiding Judge.

Following a jury trial, Leonard Freeman was convicted of burglary[1] and attempted malice murder.[2] He now appeals from the denial of his motion for new trial, assigning as error (1) the admission of statements he made during a police interview, (2) the admission of hearsay testimony of an emergency medical worker who attended to the victim, (3) the denial of his motion for a mistrial due to lack of access to real-time court reporting, (4) the closure of the courtroom during sentencing, (5) failure to sentence him as a first offender, and (6) ineffective assistance of counsel. For the reasons that follow, we affirm.

---

[1] OCGA § 16-7-1 (b).

[2] OCGA §§ 16-4-1; 16-5-1 (a).

Construed in favor of the verdict,[3] the evidence shows that a police officer responded to a nighttime 911 call about a burglary in progress and encountered Freeman, whom the officer knew, walking near the victim's address. Freeman, who lived across the street, denied any knowledge of the burglary, so the officer investigated the house for damage and, upon shining his flashlight in a bedroom window, saw Jan Nelson, Freeman's mother-in-law, on the floor covered in blood. The officer radioed for emergency medical services ("EMS"), and a responding medical technician, Russell Fortenberry, spoke to Nelson about her injuries. Nelson told Fortenberry that she had awoken to go to the bathroom and found someone in her house who tried to smother her by putting a bag over her head, and she had somehow hit her head.

An investigator arrived at the scene and learned of a small hammer and axe handle found near a pool of blood in a bedroom of Nelson's house. The investigator visited Freeman at his home, and Freeman told the investigator he had been asleep in his house at 3:00 a.m. when his phone rang, and upon seeing Nelson's name on his caller i.d., he went to go check on her. When later visited by an investigator at Nelson's hospital room, Freeman later claimed that the axe handle belonged to him,

---

[3] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

but denied ownership of the hammer. During another subsequent conversation with police outside his home, Freeman told an investigator that earlier he had misled police about being asleep, and he had actually been outside his house drinking liquor.

Freeman later gave a recorded interview at the police department, and following that, he agreed to undergo a polygraph test by a Georgia Bureau of Investigation interviewer. Before beginning the polygraph examination, Freeman met for a pre-interview session, during which he was administered a *Miranda*[4] waiver, which he signed. During the pre-interview, Freeman told the GBI interviewer that he put a bag over Nelson's head and hit her twice with a hammer. He explained that he had only "roughed [her] up" for the purpose of scaring her so that she would not continue to live alone. As a result of those statements, the polygraph test was never administered, and the GBI agent immediately advised the police investigator of Freeman's statements. Freeman, the GBI agent, and the police investigator went to a separate interview room where Freeman again told the investigator that he had placed a bag over Nelson's head and hit her in the head with a hammer. After that interview, Freeman was formally arrested.

---

[4] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Freeman was charged with aggravated assault, burglary, and attempted malice murder. Following a trial, the jury found him guilty on all three counts, and the trial court sentenced him on the burglary and attempted murder charges, merging the aggravated assault charge into the attempted murder charge. Freeman moved for a new trial, which motion was denied, giving rise to this appeal.

1. Freeman contends that the trial court erred by admitting statements he made to the police investigator immediately after his confession during the GBI pre-interview for the polygraph test. Specifically, Freeman argues that he should have been given an additional *Miranda* warning for purposes of the statement he made to the police investigator. We disagree.

The trial court addressed Freeman's challenge to the statement during a *Jackson v. Denno*[5] hearing. "Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a defendant's statement at a *Jackson v. Denno* hearing will be upheld on appeal."[6] The record from the hearing shows that Freeman was properly advised of his *Miranda* rights before

---

[5] 378 U. S. 368 (84 SCt 1774) (12 LE2d 908) (1964).

[6] (Punctuation omitted.) *Boynton v. State*, 277 Ga. 130, 131 (3) (587 SE2d 3) (2003).

4

the pre-interview, there was no significant time gap between the two interviews, and the second interview (during which the initial interviewer was present) was of a similarly non-coercive nature, even if conducted in a different interview room. Thus, "the lack of a *Miranda* warning after the break is of no consequence [because Freeman] was informed of and waived his *Miranda* rights before the first interview and the second interview was part of a continuous series of interviews."[7] "Thus, it cannot be said that the trial court erred in ruling that the [subsequent] statement was admissible."[8]

2. Freeman next argues that the trial court erred by admitting hearsay testimony from the EMS worker who treated Nelson at the scene and told the jury what she said about the attack. The record shows that the responding officer radioed for EMS immediately upon discovering "Nelson on the floor at the end of her bed[,] . . . covered in blood." The challenged testimony came from the EMS worker who was

---

[7] (Punctuation omitted.) *Mangrum v. State*, 285 Ga. 676, 678-679 (3) (681 SE2d 130) (2009) (addressing a two-hour break between interviews), citing *Williams v. State*, 244 Ga. 485, 488 (4) (b) (260 SE2d 879) (1979) ("no duty to repeat the *Miranda* warnings given the day before [because] the interviews were part of a continuing interrogation"); *Watson v. State*, 227 Ga. 698, 700 (1) (182 SE2d 446) (1971) (further warning not necessary after seven-hour lapse between statements).

[8] *Boynton*, 277 Ga. at 131 (3).

dispatched to the scene. He described Nelson as having a laceration to the top of her head with some "obvious bleeding" that was under control by the time he arrived. As he evaluated Nelson, the EMS worker "spoke with the patient just to do my initial assessment . . . like I would do with every patient to find out . . . how she got her injury and then . . . what happened during and so forth there with the injury[. S]he was alert at the time and was able to answer all of our questions." Over Freeman's objection, the EMS worker stated that when, as part of his treatment routine, he asked Nelson how she was injured, she responded that "she had gotten up to go to the bathroom and found someone in the house and they [sat on her,] had tried to smother her, and put a bag over her head, and she was unaware of exactly how she got the laceration to the top of the head."

Freeman objected to the testimony on the grounds that it was hearsay and a violation of his constitutional right to confrontation under *Crawford v. Washington*.[9] But the EMS worker

> was responsible for emergency medical diagnosis and treatment, to which the cause of the injury was relevant. Statements made for purposes of medical diagnosis or treatment and describing the inception or general character of the cause or external source thereof insofar as

---

[9] 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004).

6

reasonably pertinent to diagnosis or treatment have long been admissible under [statutory hearsay exceptions] and continue to be admissible even after *Crawford.* . . . [Nelson's] statement to the paramedic was made during his initial examination of her to ascertain the scope, diagnosis, and treatment of her injuries, and does not fall within any of the classes of testimonial statements described in *Crawford.*[10]

Therefore, under the circumstances of Nelson's statements to the EMS worker, we discern no error here.

3. Freeman next argues that the trial court erred by denying his motion for a mistrial made by his trial counsel upon learning that the State had access to real-time court reporting via an Internet feed on a laptop at counsel's table. The feed displayed the text of the transcript as entered by the court reporter, and until 11:30 a.m. on the third day of the four-day trial, Freeman's counsel was unaware that it had been available to the State and the court during trial.

Freeman's counsel objected, and during a bench conference it was established that he was aware that the system existed, but had not requested it (nor was he aware

---

[10] *Hester v. State*, 283 Ga. 367, 371-372 (4) (659 SE2d 600) (2008), quoting *Thomas v. State*, 288 Ga. App. 602, 608 (3) (654 SE2d 682) (2007) (no error in admitting hearsay statements "made to a nurse and doctor while they were examining the victim to ascertain the scope, diagnosis, and treatment of his injuries.").

that it was readily available in that case).[11] The State explained that it had referred to the system only once to make a list of quickly-recited connections on the polygraph apparatus that was not ultimately used in the case. No transcripts had been printed out for the State's use at any time. The trial court informed Freeman's counsel how to access the service over the local wireless network, and the trial continued, over Freeman's request for a mistrial.

"The trial court exercises wide discretion in controlling and regulating the business of the court, and appellate courts should never interfere with the exercise of this discretion unless it is plainly apparent that wrong has resulted from the abuse."[12] It is apparent from the trial transcript that the service was available to Freeman's trial counsel had he requested access to it, the State had not concealed its use of it, and the trial court was unaware that the State was using it and Freeman was not. Further, Freeman's counsel was able to see and hear everything in the courtroom, he was immediately given access upon request, and he did not point to any specific harm that

---

[11] Counsel's prior experience with the real-time system involved a deaf client for whom special arrangements had been made.

[12] *Williams v. State*, 205 Ga. App. 445, 447 (3) (422 SE2d 309) (1992).

occurred or any particular use he would have made of the real time transcript up to that point. Under these circumstances, we discern no reversible error.[13]

4. Freeman also asserts as error the trial court's closure of the courtroom for one witness's testimony during his sentencing hearing.[14] At the hearing, Freeman's counsel proffered that, as part of his mitigation defense, he would elicit testimony from police that Freeman would offer substantial cooperation with ongoing criminal investigations. The State did not want to impede open investigations by revealing information about those investigations, so the State requested that the trial court exclude the public during those witnesses' testimony. Freeman's counsel did not object because he believed it would benefit his client to facilitate the law enforcement testimony showing his client's cooperation.

Freeman now asserts that the trial court erred by closing the courtroom, but because Freeman agreed to the closure, "the issue of closure may only be raised in the

---

[13] See *Christopher v. State*, 262 Ga. App. 257, 264 (6) (585 SE2d 107) (2003) (harm as well as error must be shown).

[14] The trial court initially approved of courtroom closure for three witnesses, but during the hearing the closure was limited to only one witness.

context of an ineffective assistance of counsel claim."[15] This is because "[a] defendant will not be allowed to induce an asserted error, sit silently hoping for acquittal, and obtain a new trial when that tactic fails. Induced error is impermissible and furnishes no ground for reversal."[16] "[T]o hold otherwise would encourage defense counsel to manipulate the justice system by intentionally failing to object [to closure] in order to ensure an automatic reversal on appeal."[17]

---

[15] *State v. Abernathy*, 289 Ga. 603, 611 (5) (715 SE2d 48) (2011) (punctuation omitted) (quoting *Reid v. State*, 286 Ga. 484, 487 (3) (c) (690 SE2d 177) (2010). Freeman relies on *R. W. Page Corp. v. Lumpkin*, 249 Ga. 576 (292 SE2d 815) (1982), for the proposition that motions to close the courtroom must be in writing and meet other procedural safeguards. But that case relied on Code Ann. § 24-3363 of the 1933 Code which is no longer in effect, and it addressed a trial court ruling on a request by news reporters to remain present in the courtroom during a suppression hearing. See id. at 580 (5). The reversal in *R.W. Page Corp.* was therefore limited to the trial court's ruling on the reporters' requests to be present, and it did not address the underlying criminal conviction of the defendant.

[16] (Punctuation omitted.) *Anthony v. State*, 275 Ga. App. 274, 278-279 (5) (620 SE2d 491) (2005).

[17] *Reid*, 286 Ga. at 488 (3) (c). See also *Grant v. State*, 295 Ga. 126, 128 (3) (757 SE2d 831) (2014) ("Appellant's claim that the trial court erred by closing the courtroom to inquire whether the State had made a deal with a witness has not been preserved for appeal because no objection to the closure was made at trial."); *Benson v. State*, 294 Ga. 618 (2) (754 SE2d 23) (2014) (Appellant's family members were improperly excluded from voir dire but because "[a]ppellant . . . did not object to the closure at trial[, he was] procedurally barred from raising the issue on appeal.").

Despite this waiver, the dissent argues that the courtroom's closure requires reversal, emphasizing the importance of a public trial. But this precise concern was addressed in *State v. Abernathy*, in which the Supreme Court of Georgia explained that (1) "the right to public trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial,"[18] and (2) the defendant's failure to object waived appellate consideration of the issue outside of a claim for ineffective assistance of counsel, which is not presented in this enumeration.[19]

Nevertheless, in the present case, it is clear that the trial court held a hearing on the record in which it considered the least intrusive way to protect Freeman's interests in presenting mitigation evidence without hindering the State's ongoing criminal investigation.[20] The trial court carefully considered alternatives to the temporary closure as well as ways to limit closure to only certain witnesses' testimony.[21] The court made explicit findings on the record and identified the

---

[18] (Punctuation omitted.) 289 Ga. at 611 (5).

[19] See id. Freeman's ineffective assistance claim is addressed in Division 6 (c).

[20] See, e.g., *Presley v. Georgia*, 558 U. S. 209, 214 (130 SCt 721; 175 LE2d 675) (2010).

[21] See id.

11

overriding nature of Freeman's due process interest and the State's interest in protecting sensitive information involved in the criminal investigation.[22] The parties proffered specific facts supporting the trial court's findings and exercise of discretion. The closure was narrowly tailored to a single witness, and the courtroom was promptly reopened after the relevant evidence was presented; there is no indication that the full transcript of the sentencing was ever withheld from anyone seeking it. Under these circumstances, and in light of Freeman's waiver, we discern no basis for reversal on the enumerated ground.

5. Freeman also challenges the trial court's failure to sentence him as a first offender under OCGA § 42-8-60 et seq. "[W]hether or not to sentence a defendant under the first offender statute lies entirely within the discretion of the trial court."[23] Absent some erroneous belief on the part of the trial court that the law does not permit first offender treatment, we presume the trial court "acted properly in imposing the sentence."[24]

---

[22] See id.

[23] (Citation omitted.) *Tew v. State*, 320 Ga. App. 127 (739 SE2d 423) (2013).

[24] (Punctuation omitted.) Id. at 128.

12

Here, although Freeman did not request first offender treatment, it is apparent from the record that the trial court knew of Freeman's lack of criminal convictions but nevertheless sentenced him to 30 years (to serve ten) and 20 years consecutive on probation. The trial court's sentencing shows that it found the nature of the crime to be severe, and the court gave no indication that it felt *constrained* to ignore the potential for first-offender sentencing. Further, we note that Freeman was found guilty of attempting to commit malice murder, a serious violent felony that, if completed, is ineligible for first offender treatment.[25] Pretermitting whether an unsuccessful murder should be treated differently than a successful one for first offender purposes, the conduct here was of a sufficiently serious nature that we discern no abuse of discretion on the part of the trial court for failing to sentence Freeman as a first offender.

6. Freeman argues that his trial counsel was ineffective in several ways. Under *Strickland v. Washington*,[26] to succeed on an ineffective assistance claim, a criminal defendant must demonstrate both that his trial counsel's performance was deficient

---

[25] See OCGA §§ 42-8-60 (d) (1) (first offender statute); 17-10-6.1 (a) (1) (listing serious violent felonies); 16-5-1 (a) (defining malice murder).

[26] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

13

and that there is a reasonable probability that the trial result would have been different if not for the deficient performance.[27] "There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case."[28] If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court need not examine the other prong.[29] In reviewing the trial court's decision, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts."[30]

(a) *Failure to present closing argument at the Jackson-Denno hearing.* Freeman points to his trial counsel's decision, at the conclusion of the testimony adduced at the Jackson-Denno hearing, to rest on the evidence "in this specific

---

[27] See id. at 687-688, 694 (III) (A)-(B).

[28] (Citation and punctuation omitted.) *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004).

[29] See *Strickland*, supra, 466 U. S. at 697 (IV); *Fuller v. State*, 277 Ga. 505, 507 (3) (591 SE2d 782) (2004).

[30] (Punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

situation," and not present argument. The State elected to do the same. The transcript shows that Freeman's trial counsel had vigorously cross-examined the State's witness with probative and leading questions, revealing inconsistencies and challenging their answers. Trial counsel's questioning laid a clear foundation to support his theory that Freeman's statements were the product of improper interrogation, and he was not sufficiently *Mirandized*. Trial counsel's approach is in line with the common and reasonable tactic to perfect the record and not use further court time to make an argument that has become obvious through counsel's questioning. As such, in the absence of any showing that counsel's tactic was unreasonable or inadvertent, waiving argument at the hearing in this case affords no basis for reversal. "Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them."[31]

(b) *Failure to object to certain statements*. Freeman argues that his trial counsel should have objected on hearsay grounds to portions of a recorded police interview as well as testimony by an officer regarding Nelson's account of the shirt color (either

---

[31] (Punctuation omitted.) *Welch v. State*, 318 Ga. App. 202, 207 (2) (733 SE2d 482) (2012).

15

orange or yellow) of her assailant. With respect to the recorded interview, trial counsel had unsuccessfully attempted to exclude the interview during the *Jackson v. Denno* hearing. In light of that ruling, counsel elected to have the entire interview admitted rather than redact it, as part of a trial strategy to point out inconsistencies as to the assailant's shirt color. Trial counsel further highlighted the inconsistencies in his closing argument. With respect to statements by the officer regarding shirt color, Freeman does not identify the particular objectionable testimony, but these statements would have been subject to the same trial strategy employed by trial counsel.

Furthermore, alleged discrepancies about the shirt color of the assailant were overwhelmed by the other evidence of guilt. After being given a *Miranda* warning, Freeman twice volunteered to investigators that he put a bag over Nelson's head and hit her in the head with a hammer. Based on the record before us, we discern no reversible error predicated on the effectiveness of trial counsel with respect to the challenged testimony.[32]

---

[32] See *Rice v. State*, 292 Ga. 191, 210-211 (9) (f) (733 SE2d 755) (2012) (holding that, even assuming that trial counsel performed deficiently by failing to make an objection, the defendant's ineffective assistance claim failed because there was no prejudice due, in part, to the overwhelming evidence of his guilt). See also *Boyd v. State*, 286 Ga. 166, 168 (2) (686 SE2d 109) (2009) (overwhelming evidence can render harmless a *Crawford* violation arising from the admission of hearsay).

16

(c) *Consenting to close the courtroom during sentencing.* Freeman also argues that his trial counsel performed deficiently by consenting to closing the courtroom during sentencing. But, as noted in Division 4, this decision was a strategic one designed to allow mitigation evidence during sentencing. Prior to sentencing, trial counsel stated that he believed that law enforcement witnesses would be more forthcoming if the courtroom were closed. In light of this reasonable strategic decision, and in light of any showing of harm, Freeman has failed to meet his burden under *Strickland*.[33]

(d) *Failure to request first offender sentencing.* Finally, Freeman argues that his trial counsel should have requested sentencing under the first offender statute. But the record shows no inclination by the trial court to allow first offender status in light of the nature of the offenses Freeman committed. Nor was there evidence that the trial court was constrained to impose the sentence Freeman received. To the contrary, the

---

[33] See *Muse v. State*, 293 Ga. 647, 651 (2) (a) (748 SE2d 904) (2013) (Addressing a temporary courtroom closure during voir dire on jury members' experience with sensitive sexual topics, "[w]e cannot say that it was unreasonable for the lawyer to think that closing the courtroom might facilitate his efforts to [obtain a favorable jury composition], and Appellant has failed, therefore, to overcome the strong presumption that the failure of her lawyer to object to the closing was a reasonable trial strategy."); *Abernathy*, 289 Ga. at 611 (5) ("Given that the [closure] was designed with the express purpose of maximizing the odds of . . . a fair trial, [the defendant] cannot make" the required showing of harm.).

trial court noted Freeman's lack of a criminal record and that it could have sentenced Freeman from one to thirty years for the attempted murder count. Nevertheless, after recounting on the record Freeman's use of a hammer, Nelson's fractured scull, staples "all up her head," the pool of blood, and Nelson's fear that she was going to be suffocated, the trial court imposed a sentence of 30 years with 10 to serve.

Pursuant to *Strickland*, Freeman must offer more than speculation that the trial court would have sentenced him as a first offender.[34] In light of the record before us, Freeman has not meet this burden.[35]

*Judgment affirmed. Andrews, P. J., Dillard and McMillian, JJ., concur. Phipps, C. J., Ellington, P. J., and Miller, J., concur in part and dissent in part.*

---

[34] See, e.g., *Valentine v. State*, 293 Ga. 533, 537 (3) (748 SE2d 437) (2013).

[35] See generally *Humphrey v. Walker*, 294 Ga. 855, 860 (II) (A) (757 SE2d 68) (2014) ("[T]o show prejudice, the errors of counsel must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.") (punctuation omitted).

A14A0610. FREEMAN v. THE STATE.

MILLER, Judge, concurring in part and dissenting in part.

While I agree with Divisions 1, 2, 3, 5, and 6 of the majority opinion, I cannot agree with the majority's opinion as to Division 4. The Constitution of the State of Georgia mandates that "[i]n criminal cases, the defendant *shall* have a *public* and speedy trial by an impartial jury." (Emphasis added.) Ga. Const. of 1983, Art. 1, Sec. 1, Par. XI (a). The First and Sixth Amendments to the Constitution of the United States also guarantee the right to a public trial. U. S. Const. Amend. 1; U.S. Const. Amend. 6; *Presley v. Georgia*, 558 U. S. 209, 212 (130 SCt 721, 175 LE2d 675) (2010). Federal courts have held that the First and Sixth Amendment rights to a public trial attach to sentencing proceedings. See, e.g.,*United States v. Thompson*, 713 F3d 388, 393-394 (II) (8th Cir. 2013); *United States v. Rivera*, 682 F3d 1223, 1228-1229 (II) (B) (1) (9th Cir. 2012).

That is what we have here. Freeman was tried and convicted by a jury in open court, and then the State moved to close the courtroom for a portion of the sentencing proceedings. Freeman agreed to the closure. While Freeman may have waived his Sixth Amendment right to a hearing in open court by acquiescing in the State's request, a defendant cannot waive the public's interest in being present for the sentencing portion of the trial. See *Rivera*, supra, 682 F3d at 1228 (II) (B) (1) (recognizing that the "judge and prosecutor continue to bear grave responsibilities, both to the accused *and to the broader community*, during sentencing proceedings") (emphasis supplied).

Courtrooms in Georgia have too often been closed, and there are only rare circumstances in which a trial court may conduct proceedings outside the presence of the public. See *Presley*, supra, 558 U. S. at 213; Judicial Qualifications Commission, Opinion No. 239. While "[t]he right to an open trial may give way in certain cases to other rights and interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information[,] . . . [s]uch circumstances will be rare . . . and the balance of interests *must* be struck with special care." (Citation omitted; emphasis added.) *Presley*, supra, 558 U. S. at 213. Before a trial court can exclude the public from *any* stage of a criminal trial,

2

[t]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

(Citation and punctuation omitted.) Id. at 214.

In this case, the State did not advance an overriding interest that compelled the courtroom to be closed. Notably, in requesting that the courtroom be closed, the State merely stated that it expected to present evidence regarding open Georgia Bureau of Investigations (GBI) cases and that this "evidence *if* presented in open court *may* prejudice those investigations." (Emphasis added.) The State then called a GBI officer who testified that Freeman cooperated in certain investigations, but that his assistance did not yield any valuable information.[1] The officer's testimony did not disclose any sensitive information that could have possibly jeopardized any pending cases, and the State did not present any evidence that the pending cases required any additional investigation. There were other reasonable alternatives available, as the State could have established in open court that Freeman was cooperative but ultimately unhelpful.

---

[1] Although the trial court initially ordered the courtroom to be closed for other witnesses as well, the record shows that the trial judge opened the courtroom after the GBI officer testified.

3

Simply arguing that evidence may be related to a pending investigation does not satisfy the State's burden of establishing an overriding interest. If we were to hold otherwise, a trial court would be authorized to close a courtroom based on conjecture. Trial judges are the keepers of the courtroom, entrusted with serious responsibilities to the parties and to the public at large. Maintaining public access serves to guarantee the fairness of trials because it provides an opportunity for public scrutiny upon the administration of justice See *Munoz v. American Lawyer Media, L.P.*, 236 Ga. App. 462, 464 (1) (a) (512 SE2d 347) (1999) (recognizing that the news media serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice in both civil and criminal cases).

Closing courtrooms is the exception, not the rule, and, even where the parties request closure, the trial court must protect the public's constitutional right to access and limit such access only when vitally necessary. See *Presley*, supra, 558 U.S. at 212-213; Judicial Qualifications Commission, Opinion No. 239. Where, as here, the trial court unnecessarily closes the courtroom, the public's trust and confidence in judicial proceedings is eroded. For this reason, I dissent.

I am authorized to state that Chief Judge Phipps and Presiding Judge Ellington join in this dissent.

4